# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **CARLOS DAVIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 3:19-cv-00511** |
| **TYSON FRESH MEATS, INC.,** | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM</u>

Plaintiff Carlos Davis has filed suit against defendant Tyson Fresh Meat, Inc. ("Tyson"), claiming that, while employed by Tyson, he suffered race discrimination and a racially hostile work environment, was retaliated against for engaging in protected activity, and was constructively discharged, in violation of the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-401 *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Now before the court is Tyson's Motion for Summary Judgment (Doc. No. 24), seeking judgment in its favor on all claims asserted in the Complaint (Doc. No. 1-2). For the reasons set forth herein, the motion will be granted, and this case will be dismissed with prejudice.

## I. FACTUAL BACKGROUND

### A. Davis's Promotion to "Lead" and Complaint Regarding Pay Reduction

Davis is a Black former employee of defendant Tyson. He was hired to work as a mechanic at Tyson's plant in Goodlettsville, Tennessee in July 2016. [1]

Mechanics hired by Tyson obtain skill level classifications ranging from Level 1 to Level

---

[1] The facts set forth herein are drawn from the Plaintiff's Response to [Defendant's] Statement of Undisputed Material Facts (Doc. No. 29) and the evidentiary material submitted by the parties and are undisputed unless otherwise indicated.

8 as part of their participation in Tyson's training program. Mechanics advance from one level to the next by completing lab training and passing online tests. Thus, for example, Davis began his employment as a General Mechanic Level 0. (Davis Decl., Doc. No. 30-1 ¶ 1.) He progressed steadily over the succeeding months. By November 30, 2017, he had advanced to Level 5. (*See* Doc. No. 35-1, at 2.)

On December 15, 2017, Tyson posted an opening for a job classified as "Maintenance Generalist Lead Class 8" at the Goodlettsville plant. (Doc. No. 33-1, at 1.) Among other requirements, the job posting stated that acceptable applicants must "be a Level 6 General Mechanic or higher." (*Id.*) Davis applied for this position. Davis was not qualified because he was still a Level 5 mechanic at that point.[2] (Doc. No. 35-1, at 2.) The position was not filled, and the job posting was removed.

The plaintiff tested and moved up to Level 6 on January 22, 2018, and, when the same "lead" position was reposted on January 31, 2018, Davis reapplied and was selected for it, effective February 11, 2018. Davis's direct supervisor, Travis Swaffer, did not "say a whole lot" to the plaintiff about his promotion, but the plaintiff believed that Swaffer was happy about it. (Davis Dep. 43, Doc. No. 27-1, at 12.[3])

Although Davis was only at a Level 6, Jenny Stokes, the Human Resources ("HR") clerk, "entered him" in the position as a "Level 8," based on the job classification identified in the job posting, which had the effect of substantially increasing the plaintiff's rate of pay. (Denton Dep.

---

[2] The plaintiff attempts to dispute whether he was already on Level 6 at that time, but the record does not support his claim. (*See* Doc. No. 35-1 (Tyson's "Maintenance Training – Level Training – Grade Change/Rate Change" records for plaintiff, showing, in particular, that Davis progressed from Level 4 to Level 5 on November 30, 2017 and from Level 5 to Level 6 on January 22, 2018).) Even if there is a factual dispute regarding the plaintiff's training level in December 2017, it is not material.

[3] The parties filed compressed versions of the deposition transcripts, so the CM/ECF pagination and document pagination are not consistent.

21, Doc. No. 27-4, at 6; *see also* Doc. No. 35-4 (summary of investigation).) After his promotion to lead, Davis apparently noticed this pay discrepancy and asked for—and received—confirmation from both Jenny Stokes and HR Manager Isaias Ramos that he was properly classified and that his pay was correct. (Denton Dep. 22, Doc. No. 27-4, at 6; Doc. No. 30-1 ¶ 4.)

On March 27, 2018, however, the plaintiff "noticed" that his job title had been changed from "Maintenance Generalist Lead Class 8" to "Maintenance Generalist Lead Class 6," with no advance notice to him. He went to HR and was informed by Scott Kuck that his pay and position had changed a week previously—back to Level 6—also without notice to him. (Doc. No. 30-1 ¶ 9; *see also* Davis Dep. 46–47, Doc. No. 27-1, at 13.) Kuck also assured him that, although his pay was being corrected, he would not have to pay back to the company the amounts by which he had been overpaid. (Davis Dep. 47, Doc. No. 27-1, at 13.)

The plaintiff was still not happy about this turn of events, which he characterizes as a "demotion." (Doc. No. 30-1 ¶ 10.) On March 30, 2018, Davis contacted Tyson's 1-800 helpline to complain about the reduction in his position and pay. (*See* Doc. No. 35-3, at 6 (helpline log).) His complaint was assigned to Gary Denton, Tyson's HR Director, for investigation, because the complaint implicated actions taken by HR employees at the Goodlettsville plant, specifically Kuck, as well as Isaias Ramos, who had assured Davis that the initial pay raise was correct. Denton, at that time, was based physically at a Tyson plant located in Rogers, Arkansas and, as HR Director, he had responsibility for overseeing HR matters at six different Tyson facilities. (Denton Dep. 10–12, Doc. No. 27-4, at 3.)

According to Denton's summary of his investigation, Davis applied for "lead class 8" and was awarded the position, with a salary of $25.10 per hour. Davis verified the position and pay with Jenny Stokes on February 12, 2018, and Stokes confirmed that the title and pay were correct. The plaintiff consulted with Isaias Ramos the next day, who also confirmed the title and pay. Denton's investigation confirmed that Stokes made an error in entering the promotion into the

system, because Davis should have been entered into the system as Level 6 lead, with pay of $22.71 per hour. Davis received the incorrect rate of pay for five weeks, when Maintenance Training Coordinator Zak Boyce noticed that Davis was being paid at a higher hourly rate than his training level justified, and he raised the issue with Jenny Stokes. (Doc. No. 35-4, at 2.) Stokes made the correction in Tyson's system and asked Boyce to notify Davis, but he apparently did not do so. (*Id.*)

According to Denton, the "local HR" department "miss-handled [sic] the situation on multiple levels." (*Id.*). Specifically, the job posting was misleading and should not have been posted as Level 8 Lead Mechanic. Second, Stokes should have communicated the plaintiff's hourly rate change to Scott Kuck instead of assuming that he would jump from Level 6 to Level 8, and, third, after the mistake was identified, no one communicated with Davis to explain the problem and how it was being corrected until after Davis himself noticed the change in his position title and his reduction in pay. (*Id.*; *see also* Denton Dep. 21, Doc. No. 27-4, at 6 ("It was a human error based upon . . . one of the clerical individuals in the HR office. . . . He was actually a Level 6. The clerk entered him as a Level 8, which increased his pay substantially, his hourly rate.").) Denton concluded that "Davis should have been hired as a Level 6 lead, not a Level 8, because he [didn't] have the skills or the training of a Level 8." (Denton Dep. 26, Doc. No. 27-4, at 7.)

Denton met with Davis on April 10 and 11, 2018 as part of his investigation into the plaintiff's helpline complaint. Denton explained what had happened and why Davis's pay had been reduced. Denton's initial intention was to require Davis to pay back to the company the approximately $600 by which he had been overpaid, by taking $25 from each paycheck until it was returned. Davis balked at this suggestion, however. According to Denton, Davis reached out to Dan Heffernan, Vice President of HR and Denton's boss. Heffernan instructed Denton to "hold off" on deducting any amounts from the plaintiff's paychecks going forward. Ultimately, Davis was never required to return any funds to Tyson. (Denton Dep. 25–29, Doc. No. 27-4, at 7–8;

Davis Dep. 70, Doc. No. 27-1, at 19.)

      **B.     Davis's Complaint about Jose Garcia**

      Meanwhile, after his promotion to lead in February 2018, Davis began to experience what he characterizes as racial harassment by one of the mechanics with whom he worked, Jose Garcia. According to Davis's Declaration, Davis was sitting in supervisor Travis Swaffer's office on February 23, 2018 when Garcia called him a racist. (Doc. No. 30-1 ¶ 6.) Davis claims that he "immediately" reported Garcia's "remarks" to Assistant Plant Engineer, Robert Bacorn, and Plant Superintendent, Kalani Johnson. (*Id.*) After thinking about the incident over the weekend and reading Tyson's code of conduct in the employee handbook, he decided to submit a written statement to HR. (*Id.*)

      On February 26, 2018, he read his statement to Swaffer and told him he was offended that Garcia called him a racist. Swaffer told him he would contact Audrey Cooper, HR Manager,[4] about this issue. When the plaintiff followed up with Swaffer the next day, he was told that Cooper's response was that he should "be the bigger person and ignore the comments." (*Id.* ¶ 8.) Later the same day, Davis submitted his written statement to HR, specifically to HR Clerks Jenny Stokes and Gonzalo Abril, who gave it to Employment Supervisor Isaias Ramos, who passed it on to HR Manager Scott Kuck. Davis later gave the statement to Plant Engineer Todd Helmintoller. Davis was told that he "would be contacted" in regard to the statement, but, for the next month, he heard nothing about his complaint. (*Id.*)

      Because Garcia's "conduct towards plaintiff had magnified," Davis called the company's helpline again on April 4, five days after his call about the pay issue. (*Id.* ¶ 10.) According to the helpline records:

      Carlos [Davis] is a lead and has experienced harassment and discrimination since February 12, 2018. Jose Garcia has displayed demeaning, mocking, and belittling behavior towards Carlos. Jose refused to do what Carlos has asked and has tried to

---

      [4] Audrey Cooper is also Black.

avoid communication. Jose is trying to do anything he can to get him out of his position or termination. Jose told many that Carlos is a secret supervisor trying to get anyone written up. Jose has made threats such as, "You will be for us or against us. If against us, you will see what happens." Also Jose has said, "If I wanted to fuck you, I would have already fucked you." [W]hich Leo Girones overheard. On February 23, 2018, while in the office with Travis Swaffer, [Swaffer] introduced Carlos as the lead and announced the expectation of each team members [sic]. Jose accused Carlos of being racist and said that he would go to human resources about it. . . . Jose's action negatively affected Carlos especially his character. On February 25, 2018, Carlos informed Travis [Swaffer] of the statement he had prepared and plans to go to the Human Resources Department.

(Doc. No. 35-3, at 5–6.)

According to the helpline summary, the plaintiff's call dropped at that point, but he called back immediately and read into the helpline record the lengthy statement he had previously given to HR, which he wanted "put in the callback, verbatim." (*Id.* at 4.) The record of the second call includes what appears to be the entirety of the plaintiff's statement to HR, with the plaintiff reiterating that he had been experiencing "harassment and discrimination" by co-worker Jose Garcia, who had engaged in "demeaning, mocking" conduct and put Davis down before managers and other co-workers; Garcia refused to do what Davis told him to do, refused to answer radio calls, and avoided communication with him; and Garcia blamed Davis for his having been disciplined for an unexcused absence. (*Id.* at 4–5.) Davis had reported Garcia's conduct to numerous supervisors and to HR, but no action had been taken, as a result of which Garcia continued his harassing conduct. (*Id.* at 5.) Notably, the only mention of race in the two telephone calls and the plaintiff's written report to HR was that Garcia had called *him* a racist on the occasion in Swaffer's office on February 23, 2018. There is no indication in the record that Tyson interpreted Davis's complaints, at that point, as alleging race discrimination or that Davis himself had ever reported his belief that Garcia was harassing him because of his race.

Davis called the helpline again on April 9, 2018 to report that Garcia's "harassment continue[d]" and that, when Leo Girones left work early for a toothache, Garcia told him that the pain was caused by his "sucking dick like Carlos [Davis]." (*Id.* at 4.) Davis also indicated that he

had not reached anyone at HR and was becoming "discouraged" about whether the company would ever address his issues with Garcia. (*Id.*) The helpline respondent informed Davis that his allegations would be taken seriously and investigated. (*Id.*) Tyson's records reflect that an employment discrimination investigation was opened that day. (Tyson internal EEO Report, Doc. No. 35-5.)

According to his deposition testimony, Davis did not actually hear Garcia state that he felt like Davis was trying to get people written up; Leo Girones had heard Garcia say that. (Davis Dep. 77, Doc. No. 27-1, at 20.) In addition, Garcia never used a racial slur to Davis himself. Davis would not speculate as to what Garcia meant on the one occasion when he called Davis a racist. (*Id.* at 79–80, Doc. No. 27-1, at 21.) Davis heard from other people, rumors around the plant, that Garcia was accusing Davis of abusing his authority. To his face, Garcia would refuse to do things that Davis asked him to do as a way of showing disrespect, and this was "part of his pattern." (*Id.* at 81, Doc. No. 27-1, at 21.) Davis also claims that Tyson was "aware that Garcia referred to Plaintiff as the 'N word.'" (Pl.'s Resp. to Stmt. Undisp. Facts ¶ 28.) In support of this assertion, he references an email dated April 9, 2018 from Jason Dyer to several Tyson supervisors, including Travis Swaffer, Robert Bacorn, Todd Helmintoller, and Kalani Johnson, informing them that Davis and Leonardo Girones had come into Dyer's office that day, specifically choosing a day that Garcia was not at work, reporting Garcia's efforts to undermine Garcia's authority. Girones reported that "Jose will speak with him in Spanish so no one else can hear what he says about Carlos but has included such terms as the N word." (Doc. No. 33-4, at 2.) It was on that day that HR initiated its EEO investigation.

When the plaintiff's direct supervisor, Swaffer, was interviewed on April 9, 2018 by Audrey Cooper as part of her investigation into the plaintiff's complaint against Garcia, Swaffer told her that the plaintiff reported that, after he became lead, "there was an issue with Carlos [Davis] giving Jose [Garcia] direction." (Doc. No. 33-3, at 1.) As Swaffer understood it: "When

Carlos would give Jose directions, Jose would ask if [Swaffer] wanted him to do it." (*Id.*) However, Swaffer did not perceive this as a race issue. Rather, he stated, "Jose does this anytime/anyone ask[s] him to do something. He has done this since day one. He didn't do this just with Carlos." (*Id.*) He had also heard that Garcia told Davis that he would "either be for us or against us, and if you are against us you will see what happens." (*Id.*) The team members who had reported this incident to him also said that Davis responded, "If you do your job, you [won't] have any issues," and "that was the end of it." (*Id.*) Swaffer was also present when Garcia called Davis a "racist." (*Id.*) According to Swaffer:

> Jose used the word racist but that [was] not how he meant it. Carlos and I were sitting in the office. I told Carlos to keep up with team members['] break. Jose told us that he was getting ready to go to break. Carlos told Jose to call him on the radio when he was getting ready to go. Jose said to Carlos why are [you] being racist. Carlos laughed and said to Jose why would you call me racist. Jose said "I don't know the word. [L]ike being a police." Carlos said I am not being the police I'm doing what my supervisor said to do. Jose walked out of the office. Carlos said that Jose needed to learn the words. . . . That could be a bad deal. That was the end of it.

(*Id.*; *see also* Swaffer Dep. 50–51, Doc. No. 27-2, at 13.)

When Davis complained to him about Garcia, Swaffer had told him, "whenever you become . . . somebody's lead, they're going to rebel against you at first until you earn their respect. I said, it happened to me. It happened to all the other supervisors." (Swaffer Dep. 49, Doc. No. 27-2, at 13.) He stated that he "tried to explain" this to Davis: "I said, man, just do the best you can for them, show them that you're here for them, not against them, and eventually they'll start following. I mean, it's just a process we all have to go through." (*Id.*) Swaffer specifically denied that Davis ever told him he thought he was being harassed or discriminated against, even in part, because of his race. (*Id.* at 51–52, Doc. No. 27-2, at 13.)

Davis was not happy with Swaffer's advice for dealing with Garcia, however, so Swaffer "told him to go to HR." (*Id.* at 49, Doc. No. 27-2, at 13.) Swaffer also spoke to Audrey Cooper in HR. She essentially echoed Swaffer's advice to Davis: "She told him give it time, you know, pretty

much just work with everybody and stuff like that and you'll gain their respect by treating them fairly and working with them." (*Id.* at 51, Doc. No. 27-2, at 13.) Swaffer also talked to Garcia about Davis's concerns but did not discipline him. (*Id.* at 49–50, Doc. No. 27-2, at 13.)

During the internal "EEO" investigation conducted by Tyson, Leo Girones confirmed that Garcia had made inappropriate comments to him about a toothache "being related to oral sex." (Doc. No. 35-5, at 10; *see also* Doc. No. 35-6, at 1.) He also confirmed that Garcia had "used the N word" about Davis. (Doc. No. 35-6, at 1.) It is undisputed that the "N word" comment was never made directly to Davis. (Davis Dep. 100, Doc. No. 27-1, at 26.) The plaintiff did not know when Garcia made that comment or when Girones told him about it. (*Id.*) He did not report being called the "N word" in any of his helpline calls. From the record, it appears that this information first was presented to Tyson when Davis and Girones spoke to Jason Dyer on April 9, 2018, the same day the matter was referred to HR for investigation, and later repeated to Isaias Ramos when Ramos interviewed Girones. (*See* Doc. No. 35-6, at 1.)

Also according to the EEO report, when Davis was asked about Garcia's calling him a racist, Davis "stated that he didn't feel that Garcia kn[e]w what the word meant. In his call, Davis even stated that Garcia told him that he thought the word meant something to do with the police." (Doc. No. 35-5, at 2.) When Davis was asked in his deposition if he recalled stating that he did not think Garcia knew what the word meant, the plaintiff stated, "Possibly. I just can't recall. I mean it would be in the documentation." (Davis Dep. 93, Doc. No. 27-1, at 24.) Counsel pushed, asking "When Mr. Garcia called you a racist, did you get the feeling he was confused about what that even meant?" (*Id.*) The plaintiff first responded, "I don't know" but then later stated "No. No, not at all," when asked whether he had the impression that Garcia might not know what the term "racist" meant. (*Id.* at 94, Doc. No. 27-1, at 25.) However, he did not deny the possibility that he might have made that statement during his call, sticking to the statement that he did not recall whether he might have done so. (*Id.* at 95, Doc. No. 27-1, at 25.)

In his deposition, when asked if Garcia told him that he was favoring black people and that was why he accused the plaintiff of racism, the plaintiff responded, "I don't want to speculate. I don't really know why he would tell me that." (Davis Dep. 79–80, Doc. No. 27-1, at 21.) He then stated he could not remember whether Garcia had ever told him he believed Davis was favoring Black employees. (*Id.* at 80, Doc. No. 27-1, at 21.) However, the plaintiff now states, in a Declaration prepared in response to the Motion for Summary Judgment, that Garcia "openly accused [him] of treating Black employees more favorably." (Doc. No. 30-1 ¶ 5.) There is no indication in the record that the plaintiff ever reported such an accusation to Tyson.

In any event, HR concluded its investigation into the plaintiff's allegations of harassment by Garcia on April 19, 2018 and found the plaintiff's allegations of racial harassment to be unsubstantiated but his complaint about "Hostile Work Environment, Dignity and Respect" to be partially substantiated. (*See* Investigation Closing Summary, Doc. No. 35-5, at 10.) The investigator, Scott Kuck, recommended that Garcia receive a "Written Warning for Dignity/Respect," and "[a]ll involved were retrained on Harassment and Discrimination." (*Id.*) According to a status update in the EEO Report dated April 23, 2018, Garcia "resigned before the recommended disciplinary action could be delivered." (*Id.* at 2.) The plaintiff admits that Garcia's harassment of him stopped when Garcia resigned.

On April 13, 2018, the plaintiff filed a charge of discrimination with the EEOC, claiming discrimination on the basis of race and retaliation. Davis complained about both the hostile work environment created by Jose Garcia and his "demotion" from Maintenance Generalist Lead Class 8 to Maintenance Generalist Lead Class 6 and the resulting salary reduction, which Davis believed was in retaliation for his having complained about "discrimination." (Doc. No. 32-1, at 2.) He also claimed that he had been threatened with termination for refusing to agree to repay the salary amounts that had incorrectly been paid out to him at Level 8. (*Id.*)

### C.    Davis's Complaints About Chris Fournier

On May 29, 2018, Davis called Tyson's helpline to complain about Supervisor Chris Fournier. (*See* Doc. No. 35-8, at 3.) The incident about which he complained allegedly took place on May 22, 2018. On that day, he observed Fournier in the maintenance shop without a hard hat. (Davis Dep. 129, Doc. No. 27-1, at 33.) Davis, "trying to be helpful," pointed out to Fournier that he needed safety equipment. (Doc. No. 35-8, at 3.) Fournier responded: "Do I look like I'm in a playing mood?" (*Id.*) Davis responded that he was not playing. Davis claimed that, since that event, Fournier had been "singling him out." (*Id.*) Specifically, Davis had been told that he was scheduled to work on Memorial Day. When he showed up ready to work, Fournier told him he was not supposed to be there and not to clock in. The plaintiff felt this was unfair, because "everyone else was allowed to work the holiday"—presumably meaning that they received holiday pay and he did not. (*Id.*) The plaintiff feared that he might lose his job and made the report to protect himself from retaliation by Fournier. (*Id.*)

The matter was assigned to Audrey Cooper for investigation. (*Id.* at 2.) She interviewed the pertinent individuals (Fournier, Swaffer, and Davis) between June 6 and June 18, 2018. According to Cooper's report, Fournier admitted that he did not have his hard hat on and that, when Davis brought this to his attention, he indeed replied, "Do I look like I'm in a playing mood?" (Doc. No. 32-8, at 2.) He also stated that he was having a bad night but later realized Davis was

just being helpful, and he apologized to Davis the next day. (*Id.*) Fournier was disciplined for the safety violation.

Regarding the Memorial Day issue, Cooper's investigation showed that there had been a miscommunication regarding Davis's schedule. The schedule was corrected, and Davis was paid for the holiday. (*Id.*)

The plaintiff stated in his deposition that Fournier "discriminated" against him by not letting him work on Memorial Day, in retaliation for Davis's correcting Fournier's behavior. (Davis Dep. 136–37, Doc. No. 27-1, at 35.) However, he was not aware of Fournier's ever making racist statements against him and did not indicate that he had any basis for believing that Fournier treated him differently based on his race. (*Id.* at 137, Doc. No. 27-1, at 35.)

Three months later, in August 2018, the plaintiff learned that Fournier had accused him of being insubordinate and had written him up. (Doc. No. 30-1 ¶ 21.) In fact, according to Davis, a white employee had been insubordinate rather than the plaintiff. (*Id.*) The plaintiff only learned that he had been written up when Swaffer asked him about the incident. (Doc. No. 32-10.) After Davis submitted a written statement to Swaffer and HR, contesting the write-up, it was removed from his file. (*Id.*; Davis Dep. 142, 144, Doc. No. 27-1, at 37.) In other words, the plaintiff was not actually disciplined on this occasion.

### D. The Threatening Communications

On January 19, 2019, HR received a complaint, purportedly from mechanic Klint Jordan, claiming that Davis was discriminating against him and had made racist remarks. (Doc. No. 35-10 (Jan. 19, 2019 email to Tyson "Ethics"); Doc. No. 35-11, at 5 (Tyson internal EEO Report).) The email also threatened violence against Davis. On January 22, 2019, Amanda Davis, from the Ethics & Compliance Department, contacted HR employees Audrey Cooper, Gary Denton, and Scott Kuck about the threatening email from Klint Jordan, "if that is really who sent the email." (Doc. No. 35-11, at 4–5.)

Also on January 22, 2019, the plaintiff called the Tyson helpline to report that he had received a lengthy message through Facebook that purported to be from someone named Ken Davis, accusing Davis of being racist, using racial epithets, and threatening to harm or kill the plaintiff. (Doc. No. 35-11, at 3–4.) The plaintiff also made a police report about the death threat. (*Id.* at 4.)

Audrey Cooper investigated both of these reports and interviewed numerous Tyson employees, beginning on January 23, 2019 and continuing through February 5, 2019. Both Klint Jordan and Davis were placed on leave with pay during the pendency of this investigation. (*Id.* at 3.) Jordan denied sending the email received by Tyson, denied that the email address used to send the message was his email address, and reported that he and Davis had a good working relationship. Cooper met with Davis on January 23, 2019. Plant Manager Doug Griffin also attended the meeting, at Cooper's request. (Griffin Dep. 17–18, 31, Doc. No. 27-3, at 5, 8.) At some point during the meeting, Davis informed the others that he was recording the conversation. (*Id.*; *see also* Doc. No. 34-1.) Griffin told Davis that was illegal; Griffin conceded in his deposition that it was not actually illegal, but he claimed that it was against company policy. (Griffin Dep. 18, Doc. No. 27-3, at 5.) Davis's revelation about recording prompted Griffin to end the meeting. (Doc. No. 34-1.)

Cooper eventually concluded that the allegations of racism against the plaintiff were unfounded, since Jordan denied sending the email, and he and other teammates also denied that the plaintiff had ever made racist comments. (Doc. No. 35-11, at 3.) She also concluded that the plaintiff's complaint of workplace violence or threats was unsubstantiated, because the company was unable to trace the IP address to determine who sent the Facebook message to the plaintiff or to verify that it was actually a Tyson employee who sent the message. (*Id.*) No discipline was issued, but all team members were "re-trained on Tyson Foods Harassment and Discrimination Policy." (*Id.*) The investigation was closed on February 15, 2019, after a conference call among

the Ethics & Compliance, HR, and Legal Departments. (*Id.* at 2.) Scott Kuck entered a note on the investigation record that the company would "continue to cooperate with law enforcement in their investigation and will revisit this investigation if/when law enforcement is able to determine . . . the person(s) responsible" for the two messages. (*Id.*)

According to Swaffer, other Tyson employees, black and white, were receiving threatening Facebook messages around the same time, both before and after Davis received the death threat. (Swaffer Dep. 20, 84–85, Doc. No. 27-2, at 5, 21–22.) Swaffer himself began receiving threatening messages after Davis had resigned, referencing harm to Swaffer's wife and children and displaying photographs of his house taken in the middle of the night. (*Id.* at 20–21, 85, Doc. No. 27-2, at 5, 22.) He undertook his own investigation and was eventually able to confirm that the individual sending the threats was a relatively new Tyson employee named Robert Keith. (*Id.* at 21, 86–88, Doc. No. 27-2, at 6, 22.) Swaffer notified Tyson, Davis, and the police about his findings. Tyson immediately suspended Keith until further notice, and Keith never returned to work. (*Id.* at 89, Doc. No. 27-2, at 23.)

### E. Davis's Termination/Resignation

On February 7, 2019, Davis received a written warning for insubordination. (Doc. No. 32-15, at 1.) The Disciplinary Action Notification form itself states that the Plant Manager, Doug Griffin, asked Davis to "go over and help out his TEAM," and Davis responded that his "TEAM is well trained and doesn't need his Help." (Doc. No. 32-15, at 1.) The warning states that all TEAM members are to follow all directions by management that are "safe, legal, and ethical." (*Id.*) The plaintiff refused to sign the warning. (*Id.*)

On February 12, 2019, the plaintiff sent an email to numerous members of the Tyson management team, complaining about Griffin's response to the death threat he had received via Facebook. In this email, the plaintiff alleges that Griffin laughed and made light of the death threat, became angry with him when Davis mentioned that he was recording the meeting, and told Davis

to leave the building and not to return pending the investigation. (Doc. Nos. 32-16, at 1.) The plaintiff also complained that members of his team were disrespectful to him shortly after he returned to work around February 1. He reported this incident to three supervisors, including Swaffer, Fournier, and James Miester, but they did nothing and no one was disciplined. (*Id.*)

Finally, he complained about the disciplinary warning and the February 7 event that gave rise to it. In his version of the event, the plaintiff states that he was "overseeing [his] team" and "doing [his] job ensuring that line 10 [in the ground beef department] is set up on time and efficiently." (*Id.* at 2.) He claims that Plant Manager Griffin approached him and "rudely" said to him, "You're just standing there doing nothing! You are a worker! You can help you know!" (*Id.*) Griffin walked away but returned two minutes later with Operations Manager Falah Al-Saadawi and again demanded to know why the plaintiff was not working. The plaintiff states that he "tried to explain" that "all [his] guys are well trained" and he was ensuring that "this priority job gets done." (*Id.*) Griffin told him, "if I have to tell you what you need to do then you don't need that blue hat [worn by leads] on your head. You're not a supervisor, you're a worker. I expect you to work!" (*Id.*) Griffin walked away again, and Al-Saadawi allegedly told the plaintiff, "Guess what you probably won't have that job much longer . . . . We have too many chiefs and not enough Indians and that's the problem." (*Id.*) The plaintiff states that he "immediately put on some gloves and started assisting his team." (*Id.*) He complains that both Griffin and Al-Saadawi "threatened his position" and that Griffin thereafter "kept aggressively pressuring [Davis] by following [him] through the plant." (*Id.* at 2.) Davis also claims that, the next day, he received an updated Lead Expectations paper to sign, but only his job description changed, not that of other leads. (*Id.*) The plaintiff concluded:

> Doug Griffin is personally targeting me and harassing me at work. He is making false accusations to get me fired and creating a hostile work environment. I have exhausted all of my options in getting my problems solved here in Goodlettsville. I have no where else to turn to[.] I'm pleading for this stuff to stop and that I can work in a place free from harassment, discrimination and retaliation. . . . This past

year has been the worst time, and no one here seems to care . . . . [C]an someone investigate my situations please? I'm in fear of losing everything I have.

(*Id.*)

This email was forwarded to HR and an internal EEO investigation was opened. (Doc. No. 32-17.) Ryan Lid conducted the investigation. (*Id.* at 2.)

According to her February 18, 2019 report, Lid interviewed the plaintiff and other witnesses and obtained written statements from Griffin and Al-Saadawi. In his February 12, 2019 statement, Griffin states that he was in the Goodlettsville facility observing the pre-operational sanitation process on February 7, 2019 when he saw Carlos Davis standing with his arms folded. Griffin approached him, introduced himself, and asked him to "please assist [his] team members in setting up the line." (Doc. No. 32-15, at 3; *see also* Griffin Dep. 21, Doc. No. 27-3, at 6.) Davis responded that his team members were well trained and did not need his help. Griffin repeated his request. (Doc. No. 32-15, at 3; Griffin Dep. 23, Doc. No. 27-3, at 6.) Griffin walked away, but, when he returned five minutes later, Davis was still not assisting. Griffin approached him again, this time with Al-Saadawi, and again asked Davis to assist his team. (Griffin Dep. at 26–27, Doc. No. 27-3, at 7.) Davis stated that his team was doing a good job and he did not understand why Griffin was asking him to help and that that was not part of his job duties. (Doc. No. 32-15, at 3.) Griffin responded that Davis was a lead, not a supervisor, and his job was to assist his team. (*Id.*) Griffin reported the encounter to Robert Bacorn and to Travis Swaffer. (*Id.*; *see also* Griffin Dep. 25, 27, Doc. No. 27-3, at 7.) Al-Saadawi's statement essentially corroborates Griffin's. (Doc. No. 32-15, at 2.)

Lid interviewed the plaintiff on February 14, 2019, two days after he submitted his complaint. Davis testified in his deposition that his meeting with Lid went well and that she listened to him. (Davis Dep. 193–94, Doc. No. 27-1, at 49–50.) Lid, however, ultimately concluded that the plaintiff's complaint that the company had failed to investigate the death threat he had

received was unsubstantiated. The company had investigated but had been unable to determine the source of the message the plaintiff had received. (Doc. No. 32-17, at 2.) The plaintiff also claimed that he was subject to discrimination and disparate treatment, insofar as his complaint about his team-members' disrespect and insubordination was not pursued and they were not disciplined, while he was disciplined for insubordination. Lid determined that this complaint was unsubstantiated, because Davis's written discipline was for "failure to follow policy and . . . his race and prior complaints were no factors in consideration." (*Id.*) In addition, Davis's complaint about his team members "was investigated and action was taken in accordance with policy." (*Id.*) Lid concluded that the plaintiff's claim that only his duties as lead were changed was not substantiated, as "all leads were briefed on the expectations for the position and required to sign [a]n acknowledgment." (*Id.* at 3.) Finally, Lid concluded, based on her interviews of Davis's team members, that the plaintiff's allegations of race discrimination and disparate treatment were not substantiated. She recommended that the investigation be closed. (*Id.*)

In his deposition testimony, Davis continues to dispute Griffin's version of events and maintains that he was doing his job properly and that Griffin's reproach and disciplinary write-up stemmed from Griffin's being angry with him for recording their conversation during the investigation of the death threat. (Davis Dep. 176, Doc. No. 27-1, at 45.) The plaintiff claims that he was doing his job in the manner he had been trained and in the way he had always done it. (Doc. No. 30-1 ¶ 32.) He also asserts that he had seen Griffin "walking the plant hundreds of times prior to this" but that Griffin had never before approached him or taken issue with how he did his job. (*Id.*) The plaintiff also testified that, although he met with Scott Kuck and Doug Griffin about the discipline, the HR department would not investigate or even hear his side of the story, because Griffin was the Plant Manager. (Davis Dep. 172–73, Doc. No. 27-1, at 44.)

Even prior to his February 12 complaint, the plaintiff requested and was granted intermittent FMLA leave, beginning on February 8, 2019, to deal with anxiety and panic attacks.

(Doc. No. 30-1 ¶ 34.) He resigned effective February 20, 2019. (*Id.*) The plaintiff testified in his deposition that he resigned because he felt that Doug Griffin was targeting him, as evidenced by the written discipline, and it was "just a matter of time" before he was fired. (Davis Dep. 200, Doc. No. 27-1, at 51.) He now claims that he was constructively discharged.

## II.    PROCEDURAL HISTORY

Davis filed suit in the Circuit Court for Davidson County, Tennessee in May 2019. Tyson promptly removed the case to federal court. Following the completion of discovery, Tyson filed its Motion for Summary Judgment, supporting Memorandum of Law, Statement of Undisputed Facts, and complete copies of the deposition transcripts for the plaintiff, Travis Swaffer, Doug Griffin, and Gary Denton. (Doc. Nos. 24–27.) The defendant argues generally that there are no material factual disputes and that it is entitled to judgment as a matter of law as to all claims set forth in the Complaint.

The plaintiff filed his Response in opposition, Response to the Statement of Undisputed Material Facts, copies of all the same deposition transcripts and most of the same exhibits, and his own Declaration. (Doc. Nos. 28–35.) He contends that material factual disputes preclude judgment in the defendant's favor and that he is entitled to a trial. The defendant filed a Reply, objecting to some of the evidence upon which the plaintiff's Response relies. (Doc. No. 38.)

## III.    STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary

under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Reeves v. Swift Trans. Co.*, 446 F.3d 637, 640 (6th Cir. 2006). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Harris v. Klare*, 902 F.3d 630, 634–35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations— that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628.

The court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id.* The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id.* The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

## IV.      DISCUSSION

Although the Complaint sets forth only one "count," under both Title VII and the THRA,[5] the plaintiff asserts that he was subjected to race discrimination, a hostile work environment, and retaliation for engaging in protected conduct, and that he was ultimately constructively discharged. (Doc. No. 1 ¶ 33.)[6]

### A.      Race Discrimination – Disparate Treatment Claim

Title VII's anti-discrimination provision makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race," among other characteristics. 42 U.S.C. § 2000e–2(a)(1). Intentional discrimination claims under Title VII can be proven by direct or circumstantial evidence. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). The plaintiff's race discrimination claim is based upon allegations that he was treated differently than similarly situated employees who did not belong to his protected class. (*See* Doc. No. 28, at 15.) He seeks to use circumstantial, rather than direct, evidence to prove that claim. Circumstantial evidence "is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649 (6th Cir. 2012) (citing *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997)).

The court analyzes this type of claim under the familiar *McDonnell Douglas* burden-

---

[5] The plaintiff concedes that claims under the THRA are analyzed under the same framework as those based on Title VII. (*See* Doc. No. 28, at 15 n.2 (citing *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 347 (6th Cir. 2012); *Howington v. Quality Rest. Concepts, LLC*, 298 F. App'x 436, 437 n.1 (6th Cir. 2008)). Accordingly, the court does not separately address the claims under the THRA.

[6] In the same paragraph, the plaintiff asserts that the defendant "failed to take prompt and appropriate remedial actions" after the plaintiff complained about discriminatory conduct. (Doc. No. 1 ¶ 33.) The court does not understand the Complaint as attempting to assert a stand-alone cause of action based on that assertion. Rather, the employer's "fail[ure] to take prompt and appropriate corrective action" is a necessary element of the plaintiff's hostile work environment claim. *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 338 (6th Cir. 2008).

shifting approach. *Accord Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 703 (6th Cir. 2007) (referencing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). "On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine [factual] dispute at each stage of the *McDonnell Douglas* inquiry." *Id.* In *Clay*, the Sixth Circuit recognized that, while there are "many 'context-dependent ways by which plaintiffs may establish a *prima facie* case'" of race discrimination, the "key question is always whether, under the particular facts and context of the case at hand, the plaintiff has presented sufficient evidence that he or she suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." *Id.* (quoting *Macy v. Hopkins Cty. Sch. Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir. 2007)).

In this case, both parties have embraced the following construct for establishing whether Davis has made a *prima facie* case: whether he is or was (1) a member of a protected class, (2) subjected to an adverse employment action, (3) qualified for his position, and (4) treated differently than similarly situated non-protected employees. (*See* Doc. No. 25, at 13 (citing *Rio v. NHC/OP, L.P.*, 149 F. Supp. 3d 839, 845 (M.D. Tenn. 2016)); Doc. No. 28, at 15 (citing *Clay,* 501 F.3d at 703 (among others)).)

If an employee can establish each element of his *prima facie* case, "the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision. *Clay*, 501 F.3d at 703 (internal quotation marks and citation omitted). If the defendant does so, the burden shifts back to the plaintiff to show that the defendant's proffered reason is pretextual, which can be done by showing that it "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Id.* at 704 (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003)).

There is no dispute here that Davis is Black and, therefore, a member of a protected class.

There is also no dispute that he was qualified for his position. The defendant argues that Davis cannot establish a *prima facie* case of discrimination because he cannot show that he suffered an adverse employment action. Alternatively, Tyson argues that, even assuming the plaintiff can establish his *prima facie* case, he cannot show that Tyson's legitimate, nondiscriminatory reason for its actions was a pretext for discrimination.

### 1. Adverse Employment Action

"An adverse employment action in the context of a Title VII discrimination claim is a materially adverse change in the terms or conditions of employment because of the employer's actions." *Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 625 (6th Cir. 2013) (citation omitted). Termination, decrease in wage or salary, change in title, diminished material responsibilities, or a material loss of benefits are all examples of a materially adverse change. *Id.* The plaintiff asserts that he suffered an adverse employment action when his title and pay were decreased from Level 8 to Level 6 five or six weeks after he was awarded the promotion to lead.[7]

The defendant contends that the plaintiff did not suffer an adverse employment action "when Tyson reduced his pay from Level 8 Lead to Level 6 Lead" (Doc. No. 25, at 14), because the plaintiff was not entitled to be paid at Level 8 and actually received a windfall when he was erroneously paid at that level for several weeks and then allowed to keep the overpayment. The defendant's argument, on its face, effectively acknowledges that "Tyson reduced [the plaintiff's] pay"—one of the archetypal examples of an adverse employment action. In addition, the plaintiff's title was changed from Level 8 Lead to Level 6 Lead. Because the defendant does not contest any of the other elements, the court finds, for purposes of the Motion for Summary Judgment, that the plaintiff has established a *prima facie* case of discrimination.

### 2. Whether Tyson's Legitimate Non-Discriminatory Reasons for its Action Is

---

[7] The plaintiff also asserts that his "constructive discharge" qualifies as an adverse employment action. (Doc. No. 28, at 17.) The court considers constructive discharge as a separate matter, *infra*.

*Pretextual*

Tyson asserts that Davis's title and pay were increased to Level 8 in the first place as a result of two errors on the part of HR: (1) posting the position as Level 8, and (2) increasing Davis's salary to Level 8 when he was only a Level 6 mechanic. It states that the later changes in pay and title were to correct the second error. Tyson also points out that Davis was promoted to lead, which it claims further undermines the plaintiff's race discrimination claim, and that it did not require him to pay back the overpayment he received for the period of time before the company realized its error.

The plaintiff does not dispute that Tyson has proffered a legitimate, non-discriminatory reason for its action, but he argues that the reason is pretextual and that the real reason was discrimination. To show that a genuine factual dispute exists as to pretext, the plaintiff must show that the employer's proffered non-discriminatory reason for its action is not credible. *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000). The Sixth Circuit has identified "three interrelated ways" of showing pretext: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's decision." *Hostettler v. Coll. of Wooster,* 895 F.3d 844, 858 (6th Cir. 2018) (quoting *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 431 (6th Cir. 2014)). To successfully oppose summary judgment, the plaintiff must produce sufficient evidence from which a jury could reasonably reject Tyson's explanation for the salary reduction. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).[8]

---

[8] In *Chen*, the Sixth Circuit acknowledged then-recent criticism of its three-part test and emphasized that the test should not be applied formalistically, "lest one lose the forest for the trees." *Chen*, 580 F.3d at 400 n.4. Courts should engage in a commonsense inquiry: "did the employer [take the adverse action] for the stated reason or not? . . . One can distill the inquiry into a number of component parts, . . . [b]ut that should not cause one to lose sight of the fact that at bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination." *Id.*

The plaintiff insists that the defendant's claim that it made a clerical mistake "strains credibility" because:

> First, the job posting itself said it was for Maintenance Generalist Lead Class 8. Davis applied for it and was given the position, and then confirmed his title and rate of pay twice afterwards. Then, six weeks later, after he began complaining about discrimination, Tyson demoted him and cut his pay without even telling him. If it were a simple . . . clerical mistake, one would assume Tyson would have been forthright.

(Doc. No. 28, at 20.)

The plaintiff's claim that his pay was cut "after he began complaining about discrimination" is somewhat belied by the admittedly confusing timeline of events. The record shows that Davis first called Tyson's helpline complaining about his pay being reduced on March 30, 2018, when he referred to the reduction as a "breach of contract." (Doc. No. 35-3, at 6.) In this call, he stated that he first noticed on March 27, 2018 that he had been "redesignated as maintenance generalist lead class 6," down from the Level 8 Lead position he believed he had been awarded. (*Id.*) When he spoke with someone in HR, he learned that his position had actually changed "a week prior" and that he had been working at "a lesser pay without any knowledge of the changes." (*Id.*) He also noticed his pay reduction when he received his next paycheck on March 29. (*Id.*) In other words, this change had already been discovered and corrected at the HR level sometime around March 20, 2018. On March 30, 2018, after Davis called the helpline to complain about the change, Mary Stoxstell, apparently employed in Tyson's Ethics & Compliance Department, requested assistance in assigning the complaint to be investigated, because the HR personnel who would ordinarily be assigned, Scott Kuck and Isaias Ramos, were implicated in the plaintiff's complaint.

The plaintiff first called the helpline to complain about Jose Garcia on April 4, 2018, *after* he had already called to complain about the pay issue. (*Id.* at 5.) Although the plaintiff had spoken with his supervisor about problems with Garcia and had apparently sent a written statement to HR

complaining about him around the end of February 2018, the only mention of race in these early reports had to do with Garcia's calling Davis a "racist." Tyson, at this juncture, apparently did not construe—and had no reason to construe—Davis's complaints about Garcia as based on race discrimination.

Because Davis's complaint about the pay issue implicated HR employees, HR Director Gary Denton, who was based in Rogers, Arkansas, was tapped to investigate that complaint. Denton first reached out to speak with Davis about the pay issue on April 10, 2018, after the plaintiff had already called the helpline about Garcia but before he had been contacted in connection with that complaint. According to the helpline's records, Davis called the helpline again on April 12, 2018, reporting that he had been "called to the HR office to speak to Gary Denton," who "stated that he received the complaint [Davis] had submitted through the helpline." (Doc. No. 35-3, at 3.) The plaintiff has not pointed to any evidence indicating that Denton, at that point, had any knowledge of the plaintiff's complaint about Garcia, but Davis complained during his April 12 helpline call that Denton "did not say one word on the topic of harassment and discrimination from Jose Garcia." (*Id.*) The plaintiff immediately jumped to the conclusion that Denton's explanation of the clerical error affecting his pay—and, in particular, Denton's proposed plan to put Davis on a repayment schedule to return the amount by which he had been overpaid—as "a form of retaliation because [Davis] called Tyson's helpline." (*Id.*) More specifically, according to Davis, Scott Kuck had told him that he would not be required to pay back any overpayment, and Davis believed that the department had changed its mind about that after Davis made the helpline complaint about Garcia. (*Id.*)

The interaction between Denton and Davis was clearly unpleasant and rife with misunderstanding on both sides: Denton accused the plaintiff of being uncooperative and playing games when he (justifiably) would not agree to pay back the salary overpayment. Davis felt threatened and believed that "he could lose his job at any moment for filing this complaint." (*Id.*)

Regardless, it was the plaintiff's April 4 and April 9 helpline calls about Garcia, coupled with Denton's effort on April 10 to get the plaintiff to repay the salary overpayment *after* the plaintiff had previously been told that he would not have to, that caused Davis to believe that he was being retaliated against for complaining about Garcia. (*See* Davis Dep. 46–47, Doc. No. 27-1, at 13 ("We had a meeting. And . . . [Kuck] said we're not going to go back and take any kind . . . of money from you . . . . I didn't agree with the action that was taken so I reported it. . . . I reported it, then I got [the] meeting with Gary Denton right after that which then he said hey, since you brought this to my attention, we're now going to take my money, my understanding. . . . It was retaliation.").)

Several salient facts are undisputed, however: (1) HR personnel onsite at the Goodlettsville facility, not Denton, had made the decision to reclassify the plaintiff as Level 6 Lead and to reduce his pay to Level 6 pay, consistent with his training level; (2) that decision was made before the plaintiff called the helpline about Garcia and before Denton was brought in to investigate; (3) Denton apparently did not know about Davis's complaints about Garcia; and (4) Davis was never required to return the overpayment. More to the point, the plaintiff cannot point to any evidence in the record suggesting that Tyson's explanation for reducing his pay—that the job had been posted incorrectly and that his classification level was entered into the system incorrectly when he received the lead position—had no basis in fact, did not actually motivate Tyson's action, or was insufficient to explain the decision. *Hostettler,* 895 F.3d at 858.

The court finds that there is no material factual dispute and that the plaintiff cannot point to any evidence in the record that calls into doubt the veracity of the defendant's legitimate, non-discriminatory reason for reducing the plaintiff's title and pay in March 2018, five or six weeks after he was "promoted." The defendant is entitled to summary judgment in its favor on the plaintiff's race discrimination claim.

### B. Retaliation

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must demonstrate

that: "(1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (citation omitted); *see also Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018). Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a non-discriminatory reason for its actions. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 526 (6th Cir. 2008).

As with a discrimination claim, if the defendant articulates such a legitimate, non-discriminatory reason, the plaintiff, to avoid summary judgment, must present evidence to show that the defendant's stated reason "is merely a pretext for discrimination." *Id.* (citation omitted). He can demonstrate pretext by showing that the articulated reason "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Id.* (citation omitted). As the Sixth Circuit has explained:

> The plaintiff must produce sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant[] . . . did not honestly believe in the proffered nondiscriminatory reason for its adverse employment action. To show an honest belief, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made."

*Id.* (internal quotation marks and citations omitted).

The plaintiff asserts that the defendant is not entitled to summary judgment on this claim because (1) he "lodged numerous complaints about a racially hostile environment" (Doc. No. 28, at 21);[9] (2) his complaints were known to Tyson because they were made to his supervisor, HR, "Management," and the helpline; and (3) he suffered materially adverse actions when he was

---

[9] In the fact section of his Response to the Motion for Summary Judgment, the plaintiff refers to numerous other events that he suggests constituted protected behavior or adverse actions, but he does not rely upon them in the argument section of his brief.

demoted and his pay was cut.[10] Regarding causal connection, he asserts that the acutely close temporal proximity between the protected activity and the adverse actions is sufficient, at this juncture, to satisfy the element of causation for purposes of defeating summary judgment.

Tyson has produced evidence showing that the job posting was inaccurate in the first place, that the plaintiff was incorrectly reclassified as Level 8, and that he was not entitled to be classified at Level 8, having only passed the tests to reach Level 6. The plaintiff, however, makes no effort to show that the defendant's articulated reasons for reducing the plaintiff's title and pay were pretextual. As a result, his retaliation claim fails for the same reason as his discrimination claim: he has not produced any evidence calling into question the legitimacy of the defendant's articulated reasons for reducing his pay and reclassifying his job title. The defendant is entitled to summary judgment on this claim as well.

### C. Hostile Work Environment Based on Garcia's Conduct

To establish a *prima facie* case of a racially hostile work environment, Davis must demonstrate that (1) he was a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on race; (4) the harassment unreasonably interfered with his work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer is liable. *Barrett v. Whirlpool Co.*, 556 F.3d 502, 515 (6th Cir. 2009). With respect to Garcia's alleged harassment of Davis, Tyson argues that the plaintiff cannot establish the third, fourth, or fifth elements. The court finds that, even assuming that the evidence is sufficient to create a material factual dispute as to the third and fourth elements, Davis cannot establish Tyson's liability for the allegedly hostile work environment.

For the employer to be liable for harassment perpetrated by a plaintiff's co-worker, as opposed to a supervisor, the plaintiff must show that the employer "knew or should have known

---

[10] Again, the plaintiff posits his constructive discharge as an adverse action, but that claim is addressed separately, below.

of the charged [racial] harassment and failed to implement prompt and appropriate corrective action." *Barrett*, 556 F.3d at 516 (internal quotation marks and citation omitted). Tyson argues that, when the plaintiff first expressed frustration to Swaffer about Garcia, he did not complain that his harassing conducted was motivated by race. Nonetheless, Swaffer offered suggestions to Davis about how to "navigate this conflict" with Garcia (Doc. No. 25, at 18), he discussed it with Audrey Cooper in HR, and he met with Garcia. After the plaintiff complained on the helpline of "discrimination," Tyson conducted an investigation, interviewed numerous employees, retrained all implicated employees on its Harassment and Discrimination Policy (despite finding no evidence of race-based harassment), and made the determination to discipline Garcia (who resigned before the discipline was issued). Thus, Tyson argues, as soon as it had any reason to believe that the alleged harassment was race-based, it took prompt and effective remedial action.

In his Response in opposition to summary judgment, the plaintiff argues as follows:

> Tyson failed to take prompt and appropriate remedial action. Davis pled with Tyson for two months to take corrective action against Garcia. Only after he sent an email to numerous people within Tyson corporate, did Tyson conclude its investigation. In spite of Garcia accusing Davis of favoring Black people, calling him a racist, and witness statements that Garcia had referred to Davis as the "N Word," Tyson's investigation found: "None of the witnesses supported any racially motivated activities in this matter." Davis was never even informed of the result of the investigation.

(Doc. No. 28, at 23 (quoting Doc. No. 35-5, at 2; citing Doc. No. 30-1 ¶ 22.)[11]

Regarding the plaintiff's claim that he pleaded with Tyson for two months to take action against Garcia, none of the evidence in the record suggests that Tyson had any reason to know that the plaintiff believed Garcia's harassment of him was race-based prior to April 4, at the very

---

[11] The plaintiff also argues that Tyson failed to take "prompt and effective remedial action after the plaintiff received the death threat message via Facebook. Davis received the threatening Facebook message almost a year after the events concerning Garcia, and there is no suggestion that Garcia had anything to do with the Facebook message. Because Tyson's treatment of Garcia's conduct is wholly unrelated to its investigation of the Facebook message, the court considers that allegation separately, hereafter.

earliest, when he called the helpline. The only reference to race prior to that was when Garcia called the plaintiff a racist on February 23, 2018, but that single isolated comment does not suggest that Garcia's conduct was race-based or that Swaffer, the plaintiff, or anyone else identified it as such. Swaffer's uncontroverted testimony is that he believed that Garcia did not actually understand what he was saying when he called Davis "racist." As for Davis's assertion that Garcia had accused Davis of favoring Black people, that claim appears nowhere in the record other than the plaintiff's *post hoc* Declaration. He did not make that claim in his helpline calls or in his deposition. Thus, even if it is true, there is no reason Tyson would have known about it.

As for "witness statements that Garcia had referred to Davis as the 'N Word,'" the only "witness" who made that statement was Leo Girones, first to Jason Dyer on April 9, 2018 and later when he was interviewed by Isaias Ramos. (*See* Doc. No. 35-6, at 1.) A single allegation that Garcia used a racial epithet on one occasion outside the plaintiff's presence does not dictate a conclusion that the harassment was race-based. In light of the other evidence before Kuck, it was not unreasonable for him to determine that Garcia's conduct was not race-based. Moreover, the fact remains that Tyson investigated the plaintiff's discrimination claim with reasonable promptness, beginning within five days of the plaintiff's April 4 helpline call, made the determination to issue Garcia a written warning for "Dignity/Respect," and ensured that "[a]ll involved were retrained on Harassment and Discrimination." (Doc. No. 35-5, at 3.) Garcia quit before he was reprimanded, however, and the plaintiff admits that the harassment by Garcia stopped after he resigned.

Finally, while it does seem like oversight for Tyson not to have officially notified the plaintiff of the results of its investigation, Tyson's record of the event states that the plaintiff called the helpline to ask about the status of the case on April 27, 2018 and was informed that, "[d]ue to confidentiality reasons," he would not be informed of any corrective action taken. (Doc. No. 35-5, at 2.) The plaintiff has not pointed to caselaw suggesting that Tyson's obligation to take prompt

and effective remedial action encompassed an obligation to notify the plaintiff of any disciplinary measures taken against others.

Accordingly, the court finds that there are no material factual disputes and that the defendant is entitled to summary judgment in its favor on the plaintiff's hostile work environment claim related to Jose Garcia's conduct.

### D. Hostile Work Environment—the Facebook Death Threat

Insofar as the plaintiff also contends that his receipt of the death threat message via Facebook, purportedly from someone named Ken Davis, also created or contributed to a hostile work environment, the court notes that this event took place nearly a year after the Garcia incident and has no connection with it whatsoever. The defendant argues that, regardless of whether the Facebook threat gave rise to a hostile work environment, the plaintiff cannot establish that Tyson is liable for it. The plaintiff argues that Tyson "utterly failed in its duty to take prompt and appropriate remedial action," because, "when Davis brought the racist death threat Facebook message to Tyson's attention, Tyson instead focused it's [sic] investigation on the complaint against Davis, downplayed the significance of the threat, downplayed that it was racially motivated, and placed Davis on leave pending investigation." (Doc. No. 28, at 23.) In other words, it appears that the plaintiff is complaining about the manner in which Tyson conducted its investigation into his complaint. Reading between the lines, the court understands the plaintiff to be arguing that Tyson—and specifically Doug Griffin—was insensitive to the plaintiff's legitimate fears arising from the threat and did not conduct the investigation with sufficient tact.

The plaintiff reported having received the message, and his belief that it was from someone at Tyson, on January 22, 2019. HR began investigating the plaintiff's allegations the next day. At the same time, HR was also investigating a complaint that it had received by email, purportedly from Klint Jordan, alleging that the plaintiff was a racist but also threatening violence, in language very similar to that used in the message to the plaintiff. According to Tyson, both Jordan and Davis

were placed on paid leave pending the outcome of the investigation, pursuant to company policy. Tyson's investigation confirmed that Jordan had not sent the message that Tyson had received, had a good working relationship with the plaintiff, and had never accused the plaintiff of being a racist.

Likewise, Tyson could not verify who sent the Facebook message to the plaintiff or whether it was a Tyson employee at all. The company, therefore, closed the investigation, while noting that it would continue to cooperate with law enforcement. Swaffer continued investigating independently, since he, too, had received threatening messages. He discovered the identity of the perpetrator and notified Tyson and the plaintiff, who had already resigned by then. Tyson immediately suspended the individual responsible, and he never returned to work again. Swaffer's findings were also reported to the police.

There is no evidence that Tyson failed to take prompt and effective remedial action in response to the plaintiff's complaint about the Facebook message. Moreover, regardless of whether Doug Griffin appeared to be insensitive in conducting the interview with the plaintiff, that factor alone is not sufficient to create a hostile work environment or a material factual dispute as to whether Tyson took reasonable efforts to address the plaintiff's complaint about the death threat. The defendant is entitled to summary judgment on this issue as well.

### E. Constructive Discharge

"The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" *Green v. Brennan*, 136 S. Ct. 1769, 1776 (2016) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004)). "When the employee resigns in the face of such circumstances, Title VII treats that resignation as tantamount to an actual discharge." *Id.* at 1777.

The Sixth Circuit has characterized Title VII constructive discharge claims as a "tough row

to hoe" and "hard to prove." *Groening v. Glen Lake Cmty. Schs.*, 884 F.3d 626, 630 (6th Cir. 2018). To prove such a claim, an employee must show that his working conditions were "objectively intolerable and that [his] employer deliberately created those conditions in hopes that they would force [him] to quit." *Id.* In addition, "[t]he doctrine does not protect employees who leave their job 'in apprehension that conditions may deteriorate later.'" *Id.* (quoting *Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002)). The Sixth Circuit has expressly recognized that an employer's criticism of an employee, especially when it is "limited to a few isolated instances," does not amount to constructive discharge. *Id.* at 631. Likewise, the court has "repeatedly held . . . that neither an internal investigation into suspected wrongdoing by an employee nor that employee's placement on paid administrative leave pending the outcome of such an investigation constitutes an adverse employment action." *Id.* (quoting *Dendinger v. Ohio*, 207 F. App'x 521, 527 (6th Cir. 2006)).

The defendant argues that it is entitled to summary judgment on the plaintiff's constructive discharge claim, first, because Davis did not properly plead constructive discharge in the Complaint. Alternatively, the defendant argues that the plaintiff cannot prove objectively intolerable conditions, that Tyson created them, or that they forced the plaintiff to quit. Instead, the plaintiff admitted in his deposition that he resigned because he believed that Doug Griffin was targeting him and intended to fire him. (Doc. No. 25, at 25 (citing Davis Dep. 200).)

In the referenced passage of his deposition, Davis was asked, "Was there a particular thing that happened that caused you to decide that you needed to resign?" (Davis Dep. 200, Doc. No. 27-1, at 51.) His answer: "Doug Griffin." (*Id.*) Asked to elaborate, he explained: "I felt like it's just a matter of time before I get fired or – yeah, Doug Griffin is the boss. He's the head of the plant so when he's coming after you you're not going to last long. He's going to get you. . . ." (*Id.*) Davis believed that, no matter what he said or did, he was "on the chopping block" because Griffin was after him. (*Id.* at 201, Doc. No. 27-1, at 51.) His conclusion in this regard was based on

Griffin's having "fabricated" the story that led to his written warning, which he believed was in retaliation for his having recorded the meeting with Audrey Cooper and Griffin when they met with him about the death threat Facebook message. (*Id.*) As indicated above, he also believed that Griffin's behavior during that meeting—laughing and making light of the message that terrified the plaintiff—was insensitive and inappropriate for a Plant Manager. (*Id.* at 203, Doc. No. 27-1, at 52.)

In his Response to the Motion for Summary Judgment, the plaintiff argues that he has created at least a material factual dispute as to whether he was constructively discharged "due to a series of events spanning over a year" that, considered together, would have caused any reasonable person in Davis's position to resign. (Doc. No. 28, at 17.) There are several problems with this argument. First of all, none of the events about which Davis complains had anything to do with race except, arguably, the dispute with Garcia and the investigation a year later into the Klint Jordan email and the Facebook message death threat. In between those two events, which occurred nearly a year apart, the plaintiff points to a series of minor and petty events, none of which amounted to an adverse employment action and none of which is alleged to have had any racial or racist overtones. Second, neither the Garcia issue nor the threatening messages gave rise to adverse conditions *created by Tyson*. They were situations caused by other employees that Tyson attempted to address when they were brought to its attention.

And finally, when the plaintiff resigned, he expressly blamed it on his interaction with Doug Griffin, based on his belief that Griffin was going to fire him anyway. As stated above, an employer's investigation into an employee, suspending him with pay during an investigation, and giving him a written write-up for a disciplinary infraction are not sufficiently adverse to give rise to a constructive discharge. *Groening*, 884 F.3d at 631. The situation about which the plaintiff complained was not objectively intolerable enough to give rise to a constructive discharge claim.

There are no material factual disputes, and the defendant is entitled to summary judgment

in its favor on the constructive discharge claim as well.

## V.      CONCLUSION

For the reasons forth herein, the defendant's Motion for Summary Judgment will be granted, and this case will be dismissed in its entirety.

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge